## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| **The Harris Agency, LLC,** | : | |
| **Debtor.** | : | **Case No. 09-10384 (JKF)** |

_____

## MEMORANDUM OPINION

**BY:   JEAN K. FITZSIMON**
**United States Bankruptcy Judge**

The Law Offices of Paul J. Winterhalter, P.C. ("Winterhalter" or the "Firm")

seeks payment on its First and Second Interim Applications for Compensation

and Reimbursement of Expenses (collectively, the "Applications").[1]  The

Applications are contested by the United States Trustee and the Chapter 11

Trustee.  As discussed in detail below, Winterhalter, who represented the Debtor

from the inception of this Chapter 11 case on January 20, 2009, was disqualified

on May 10, 2010 due to an actual conflict of interest.  Following the order

disqualifying Winterhalter, and preceding a determination on the Applications,

further objections were filed which allege that Winterhalter had an additional,

undisclosed conflict of interest prior to the one that caused its May, 2010

disqualification.  A hearing was held on this matter on January 5, 2011, and

continued to February 22, 2011.  Upon consideration, the Court concludes that

---

[1] As per agreement at a hearing on January 5, 2011, the Applications are to be treated as final, rather than interim, fee applications.

Winterhalter did have an actual conflict of interest as of the earlier date and,

therefore, that the majority of the Firm's fees should be denied and disgorged

accordingly.

# I. BACKGROUND

### *History of the Debtor and its Affiliates*

The Harris Agency, LLC ("Harris" or the "Debtor") is an insurance agency

which services predominantly commercial business insurance needs.  In 2005,

Nevada Investment Partners, LLC ("NIP") formed to acquire Harris' business from

its then owner, Brown & Brown Insurance of Nevada, Inc. ("Brown & Brown").

The membership interests in NIP were held by Randall Siko, Eric K. Bossard,

Debra Agnew, and Fred Milbert.  The members, or most of them, also have

formed the following entities, which are thus related to the Debtor: Alliance

Insurance Services, LLC ("Alliance"), Archway Insurance Services, LLC

("Archway"), and Union One Insurance Group, LLC ("Union One").  In 2007, NIP

and Brown & Brown negotiated an Account Acquisition Agreement, providing for

the sale of the Harris Agency's book of business to the Harris Agency for

$5,250,000.  Half of the purchase price was due upon signing, 25% was due on

January 23, 2008, and the final payment of 25% was due on July 23, 2008.  See

Docket Entry No. 93.

Funding was arranged through Brooke Credit Corporation ("Brooke") in September 2007.  The Debtor, along with NIP and Union One, borrowed $2,924,125 from Brooke on a secured basis (the "Brooke Loan"), including a pledge of assets from the Debtor.[2]  Transcript of March 10, 2010 Hearing, Docket Entry No. 210 - hereinafter "3/10 Tr." - at 25.  The Brooke Loan was negotiated by James Agnew, the husband of Debra Agnew (one of the members of NIP).  3/10 Tr. at 21.

Archway lent the Debtor and NIP approximately $1.3 million to make the second payment on the Brooke Loan, drawing from its line of credit at M&T Bank. 3/10 Tr. at 25-27.  Over a period of time beginning after 2008, Archway also lent the Debtor $445,000 due to diminished cash flow and the need to maintain operating expenses. 3/10 Tr. at 27.[3]  Accordingly, Archway is a creditor of the Debtor.  Union One (whose membership interests mirror those of the Debtor and its affiliates) lent the Debtor $180,000 for the same reason.  Id. at 28.  Therefore, Union One also is a creditor of the Debtor.

---

[2] Brooke since has sold its interest in the loan to a consortium of five banks-the Bank of Commerce and Trust, Garden City State Bank, Peabody State Bank, Kendall State Bank and First United Bank and Trust MD (collectively, the "Consortium Banks").  Docket Entry No. 93 at 8.

[3] This debt is listed as an unsecured debt in the amount of $444,500 on Schedule F (Docket Entry No. 38 at 9).  However, the creditor on that document is incorrectly named "Alliance Insurance Services, LLC;" it should read "Archway Insurance Services, LLC."  See Docket Entry No. 196 at 6, n.2; 3/10 Tr. at 45-46.  Alliance is another related entity discussed here who is a creditor of Harris by virtue of paying the Debtor's legal fees.

The Debtor was unable to make the third payment to Brown & Brown on

the Brooke Loan, finding that the volume of business was not what it expected.

On December 3, 2008, Brown & Brown recorded a judgment against the Harris

Agency in Nevada.  This judgment precipitated the filing of the Debtor's

Chapter 11 petition on January 20, 2009.  Docket Entry No. 93.

The Debtor filed a proposed Plan of Reorganization and Disclosure

Statement on September 8, 2009[4] (the "Plan" and "Disclosure Statement," Docket

Entries Nos. 92 and 93).  Pursuant to the Plan, Archway was to contribute

$110,000 in new equity in exchange for receiving 50% of the equity interest in the

reorganized debtor, without waiving its right to payment on its unsecured claim.

Plan at  §IV.5, §VI.B.1, Disclosure Statement at 10.  Trinity Capital Management

Group, LLC., a separate company owned by James Agnew, was to have its

$109,500 secured claim for a post-petition loan satisfied in consideration for

receiving the other 50% equity interest in the reorganized debtor.  Plan at §IV.3,

Disclosure Statement at 10, 12.  Upon completion of the Plan, Randall Siko, Eric

Bossard and James Agnew were to act as officers and directors of the Debtor.

Plan at 14.  The Plan calls for the secured debt of the Consortium Banks to be

paid in full "subject to the terms and conditions set forth in the original loan

documents" (although the loan terms and interest rate are modified).  Plan at

---

[4] Although the Plan and Disclosure Statement were withdrawn on November 4, 2009, the Court finds the information contained in these documents relevant and useful for this discussion.

§IV.2.  The Plan did not contemplate any payment of the Brooke Loan from any

of the Debtor's co-obligors thereon.

***Events Leading to and Details of the Disqualification Order***

On January 20, 2009 (the day the Debtor filed for bankruptcy protection),

Winterhalter filed an Application for Employment of Counsel (the "Application for

Employment") pursuant to 11 U.S.C. § 327, which was accompanied by a Verified

Statement of Counsel in Support of Application to Employ Counsel for Debtor (the

"Verified Statement," Docket Entry No. 6).  The Verified Statement was submitted

pursuant to Bankruptcy Rule 2014.[5]  The Verified Statement contained the

following sworn statements:

> 3. To the best of my knowledge, information, and belief, neither I, nor
> any member of my firm has any connection with any party in interest,
> the respective attorneys, or accountants, the United States Trustee
> or any person employed in the Office of the United States Trustee.
>
> 4. Neither I, nor the firm of Paul J. Winterhalter, P.C. represents an
> interest adverse to the Debtor herein or this Estate in matters upon
> which I am engaged or the firm is to be engaged.

Affidavit of Paul J. Winterhalter, Docket Entry No. 6-1 at 1.  On January 22, 2009,

the Court "conditionally" issued an Order approving Winterhalter's Application for

Employment, "with the Law Firm to be paid at such compensation as the Court

shall allow, only after approval of an Application. . . ." and noting that "Counsel

promptly shall file a disclosure of any retainer received and the rates proposed for

this engagement" (the "Retention Order," Docket Entry No. 11).

---

[5] Bankruptcy Rule 2014 and Section 327 of the Code are discussed in detail, below.

Following the Retention Order, Winterhalter filed a Disclosure of

Compensation pursuant to 11 U.S.C. § 329(a)[6] and Bankruptcy Rule 2016(b)[7]

(the "2016 Statement"), disclosing that it had agreed to accept $50,000 for legal

services for the Debtor, that it had received $23,200 prior to the filing of the

statement, and that the $23,200 received had been paid by the Debtor and

Alliance.  Docket Entry No. 12.  The 2016 Statement also noted that Alliance or

its affiliates (together, the "Affiliates") would pay the balance owed to

Winterhalter.  Id.

On January 7, 2010, Winterhalter filed its First Application for

Compensation and Reimbursement of Expenses, seeking payment of

$113,515.75 in fees and reimbursement of $2,636.92 in expenses for the time

period of January 20, 2009 (the inception of the case) through December 31,

2009 (the "First Fee Application," Docket Entry No. 158 ).  Paragraph 8.f of this

Application indicates that "[a]ny fees awarded will be paid from the estate."  Id.

at 2.  The final paragraph of the First Fee Application states:

---

[6] 11 U.S.C. § 329(a) states, in relevant portion, "any attorney representing a debtor in a case under this title . . . whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of in connection with the case by such attorney, and the source of such compensation."

[7] Federal Rule of Bankruptcy Procedure 2016(b) states, in relevant portion, "(e)very attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States Trustee within 14 days after the order for relief . . . the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity.  The statement shall include the particulars of any such sharing or agreement to share by the attorney. . . .  A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed."

6

> The Applicant was originally paid an initial retainer totaling $23,200
> through various payments made prior to the Petition Date.  The
> Applicant incurred and billed the Debtor the sum of $18,061.75 for
> legal services rendered prior to the Petition Date.  This left a balance
> on the retainer totaling $5,138.25 as of the date of the filing.  This
> sum should be credited against the fee award allowed by the Court.

Docket Entry No. 158 at 5.

Some three weeks after the First Fee Application was filed, Frederick I.

Milbert, an interested party by virtue of his ownership interest in NIP,[8] filed an

Objection to the First Fee Application, contending (and providing evidence) that

Winterhalter had received undisclosed, post-petition payments from Archway and

Alliance without court-approval.  Docket Entry No. 176.  The next day, the United

States Trustee (the "UST") also objected to the First Fee Application due to

Winterhalter's failure to disclose payments from third-parties.  Docket Entry

No. 177.[9]

Following these objections, Winterhalter filed an Amended and

Supplemental Verified Statement Further Supporting the First Interim Application

for Professional Compensation (the "Amended Verified Statement," Docket Entry

No. 178).  The Amended Verified Statement discloses, for the first time, that

Winterhalter received periodic payments since the commencement of the case

---

[8] Mr. Milbert's status as an interested party is disputed by the Debtor.

[9] In addition, the UST objected to the alleged use and billing of attorneys' time for non-legal work.
This objection is answered to the Court's satisfaction by Winterhalter in a Supplemental Reply.  Docket
Entry No. 195.

for services rendered totaling $77,893.11 from Archway and Alliance.  Id. at

¶¶ 5,7.  Winterhalter asserts in the Amended Verified Statement that it had a

"mistaken belief" that Bankruptcy Rule 2016(a) required only disclosure of post-

petition payments received from the debtor.  Amended Verified Statement at ¶6.[10]

According to the Exhibit attached to the Amended Verified Statement, $40,393.11

was paid by Archway and $37,500 was paid by Alliance.  Docket Entry No. 178,

Exhibit 1.  These payments were made from February 4, 2009 through

January 19, 2010.  Id.  Following the initial amendment of the Verified Statement,

the document has not been amended or updated by Winterhalter.

   After reviewing the Amended Verified Statement, the UST sought

disqualification of Winterhalter and disgorgement of the Firm's fees on an

expedited basis (the "Motion to Disqualify," Docket Entry No. 188).  The UST

contended that Winterhalter should be removed as the Debtor's counsel

because: 1) the Firm failed to comply with disclosure requirements both in its

Employment and Fee Applications; 2) Winterhalter improperly accepted fees

without prior order of the court; and 3) the Firm's payment arrangement created

an impermissible conflict of interest.  Docket Entry No. 188 at 4-10.

   A hearing on both the First Fee Application and the Motion to Disqualify

was held on March 10, 2010 (the "March Hearing").  At the March Hearing,

---

[10] Federal Rule of Bankruptcy Procedure 2016(a) states, in relevant portion, "[a]n application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised. . . ." (emphasis added).

James Agnew, the managing member of Archway and part of the management team of Alliance, testified that the "family of companies" - Archway, Alliance, and Union One - agreed to pay Winterhalter's legal fees in connection with this Chapter 11 case. 3/10 Tr. at 30 -31. The individual members of these companies (with the exception of Mr. Milbert) also individually guaranteed Winterhalter's fees. 3/10 Tr. at 32. It was learned for the first time at the March Hearing that the Debtor owed Archway $1.3 million for a pre-petition loan. 3/10 Tr. at 25-27; 57. Mr. Agnew testified that Archway and Alliance expected the Debtor to repay them for any payments they made to Winterhalter; "I'm looking directly to the Harris Agency for that." 3/10 Tr. at 58. Following the submission of post-hearing briefs by the UST and Winterhalter, the matters addressed at the March Hearing were taken under advisement.

With the issuance of a detailed order on May 10, 2010, the Court ruled on these matters and held that Winterhalter had an actual conflict of interest which mandated immediate disqualification of the Firm (the "Disqualification Order," Docket Entry No. 217). According to the Disqualification Order:

> Winterhalter's receipt of payments from Archway created an actual conflict of interest, at least by the time the Plan was prepared, due to the following: (1) Archway is an unsecured creditor of the Debtor; (2) Archway was a proposed contributor to the Plan and would have been a 50% owner of the reorganized debtor; (3) Archway is owed approximately $1.3 million by the Debtor on a pre-petition loan; (4) Archway had paid some of Winterhalter's fees; and (5) Mr. Agnew testified that Archway expected to be reimbursed by the Debtor for any payments made to the Debtor's counsel . . . the

interests of the Debtor and Archway were potentially at odds
because Archway was owed money from the Debtor (and also
expected to be repaid for the funds advanced to Winterhalter) and
the proposed Plan had Archway acquiring ownership of the
reorganized Debtor.

Disqualification Order at 10-11.  However, the Court declined to impose additional

sanctions on Winterhalter for failing to disclose third-party payments (even though

it had violated the Code and Rules in doing so), finding that the Firm had acted in

good faith and without prolonged delay.  Id. at 6-8.[11]

With regard to the question of Winterhalter's fees, the Court was "unwilling

to grant . . . disgorgement of all fees received or earned by Winterhalter since the

inception" of the case, because it was "unclear when precisely the conflict of

interest arose, and it appeared that Winterhalter had acted in good faith."

Disqualification Order at 12.  Therefore, Winterhalter was ordered to "assist and

cooperate" with new counsel appointed by the Debtor, and was permitted to file a

fee application seeking compensation for work in helping "to choose, cooperate

with, assist, and inform the Debtor's new counsel (and matters related thereto)."[12]

Disqualification Order at 13.  Pursuant to the Disqualification Order, and due to its

actual conflict of interest, the Firm was mandated to disgorge fees incurred in

---

[11]  The Court further held that there is no duty to file a fee application pursuant to 11 U.S.C. § 330
when an attorney or law firm's fees are being paid by a non-debtor; therefore, Winterhalter did not violate
any provision by failing to file an application for receipt of payments from Archway or Alliance.
Disqualification Order at 8-9.  The Court notes, nonetheless, that both its Retention Order and the 2016
Statement required application prior to *any* fee payment.

[12]  Following the disqualification of Winterhalter, a Chapter 11 Trustee was appointed on June 17,
2010.  The Firm has sought no fees in connection with getting counsel for the Trustee up to speed.

connection with preparing the Plan and Disclosure Statement, as would be

determined at a hearing to be held after new counsel prepared and filed a plan

and disclosure statement.  Id. at 13-14.  Lastly, the Court determined that return

of any disgorged funds to the *estate* (as opposed to the Affiliates) - as the UST

sought (and seeks) - was inappropriate.  Id. at 13, n.18.

***Events Following the Disqualification Order and Preceding the January,
2011 Hearing on the Fee Applications***

Winterhalter's Second Application for Compensation and Reimbursement

of Expenses (the "Second Fee Application"), seeking $62,518.50 in fees and

$1,383.08 in expenses from the time period of January 1, 2010 through May 10,

2010 (the date of the Disqualification Order), was filed on May 20, 2010.  Docket

Entry No. 236.[13]   That same day, the Firm filed a Motion to Reconsider the

Disqualification Order, arguing that the Court had misinterpreted certain

statements by witnesses and misconstrued case law in this circuit (the "Motion to

Reconsider," Docket Entry No. 241).  Upon consideration and after a hearing on

June 30, 2010, the Court denied the Motion for Reconsideration.  Neither the

issuance of the Disqualification Order nor the denial of the Motion for

Reconsideration was appealed.

---

[13] The UST filed a preliminary objection to the Second Fee Application on June 9, 2010,
contending: 1) that the Application sought compensation exclusively for time after the Firm's
disqualification and, therefore, that all fees sought should be denied; and 2) that proper supporting
material for the expenses sought were not provided.  Docket Entry No. 272.

Although the Disqualification Order originally called for a hearing on Winterhalter's fees to be held after new counsel had prepared a plan and disclosure statement, the parties agreed that once the motion for the sale of Debtor's assets outside the ordinary course of business pursuant to Section 363 of the Code was granted (and an amended plan and disclosure statement were not in the offing), a hearing on the Fee Applications was timely.[14]  That hearing was first scheduled for the summer of 2010, but was continued to January 5, 2011.

Prior to this hearing on Winterhalter's fees, the UST supplemented its Objection to the First Fee Application[15] and brought the following new information to light:

> Since May 10, 2010, the United States trustee has discovered that Winterhalter represented a creditor and co-obligor of the Debtor, that is to say, Winterhalter entered its appearance on behalf of Union One Insurance Group, LLC ("Union One") in the United States District Court for the Eastern District of Pennsylvania in the matter of *Kendall State Bank, et al. v. Union One Insurance Group, LLC* in case 09-494 (JK) (sic) (See Exhibit 2).  While benign in its face, the Court needs to understand that the underlying litigation involved the loan obligation of the Debtor owed to Kendall State Bank as to which Debtor and Union One are co-obligors, and that Union One is a creditor of the Debtor. . . .

---

[14]   The Court notes that Winterhalter, instead of assisting the Debtor in obtaining new counsel, essentially ignored the Disqualification Order - which clearly and immediately disqualified the Firm in this case as of May 10, 2010 - by continuing to represent the Debtor (see e.g., Motion to Dismiss, Docket Entry No. 243).  This is an indication that Winterhalter took neither that Order nor its message seriously.

[15]  This Objection supplements Docket Entry No. 177.

Docket Entry No. 326 at 2 (the "Supplemental Objection").  Attached as Exhibit 2

to the Supplemental Objection is a copy of an Entry of Appearance, dated

March 10, 2009, by Winterhalter on behalf of Union One in the District Court for

the Eastern District of Pennsylvania in the matter of Kendall State Bank, *et al* v.

Union One.  Docket Entry No. 326, Exhibit 2 (the "Entry of Appearance").

### *The January and February, 2011 Hearings and Related Briefs; the Parties' Current Positions with Regard to the Fee Applications*

A hearing on both Fee Applications was held on January 5, 2011 (the

"January Hearing").[16]  The UST pressed the point raised in the Supplemental

Objection, namely that Winterhalter should be disqualified as of March 10, 2009

due to its representation of Union One in District Court, and calculated the

amount of fees up to that date to be $40,612.  Transcript of January 5, 2011

hearing, Docket Entry No. 385 - hereinafter "1/5 Tr." -  at 6-7.  Winterhalter, on

the other hand, asserted that it only had "limited activity" with regard to Union

One in March, 2009, "filing a Suggestion of Bankruptcy for that Federal Court

litigation.  Nothing transpired in that litigation other than filing the Suggestion of

Bankruptcy in resolving that litigation."  Id. at 8.  Winterhalter further contended

that its participation in the injunction action came only *after* the Disqualification

Order of May 10, 2010.  Id.  Upon further questioning by the Court, Winterhalter

stated that it was representing Union One in District Court "because the Harris

---

[16] At the January Hearing, Winterhalter withdrew consideration of the Firm's Westlaw expenses in the Applications.  Transcript of January 5, 2011 hearing, Docket Entry No. 385 at 6.

Agency was an integral party." Id. at 11.  It is important to note that these

statements by Winterhalter were made more than five months *after* the UST's

brief showed (via the attached exhibit) that the Firm had filed its appearance on

behalf of Union One in the District Court on March 10, 2009.

Following the January Hearing, the hearing on the Applications was

continued and the parties were allowed to submit additional briefs on the matter,

which they did.  In its Memorandum Objection, the UST again alleges that

Winterhalter had a conflict of interest due to its representation of Union One as of

March 10, 2009 and, therefore, that all fees should be denied as of this date.

Docket Entry No. 386 at 3-4 (the "Current Objection").[17]  Attached as Exhibit B to

the Current Objection is the docket in the District Court case Kendall State Bank

et al. v. Union One (the "District Court Action").  Docket Entry No. 386, Exhibit B.

This docket lists Winterhalter as the Defendant's (Union One) counsel as of

March 10, 2009.  Id. at 15.[18]

The relief sought in the District Court Action by the Consortium Banks was

payment from Union One, a co-obligor with the Debtor, as well as an injunction

against Union One interfering with or contacting clients of the Debtor.  Transcript

of February 22, 2011 hearing, Docket Entry No. 409 - hereinafter "2/22 Tr." -

---

[17] A Joinder to the Current Objection was filed by Silverman Burns Kasmen and Krawitz.  Docket
Entry No. 397.  The Silverman firm has been involved in various prepetition matters related to the Debtor.

[18] The District Court Action was filed on February 2, 2009.  Docket Entry No. 386, Exhibit B at 14.

14

at 21.  On March 30, 2009, a Stipulation and Order was entered that "a responsive pleading by Defendant" was to be filed by April 29, 2009.  Id. at 15; Docket Entry No. 12 in District Court Action.  The District Court Action was placed in "civil suspense" on June 18, 2009 and remained so until June 10, 2010, when the Plaintiffs in that case filed a Motion for a Preliminary Injunction to Enforce Agreement to Appoint Management Consultant and Prevent Dissipation of Collateral and to Place Matter on Active Docket.  Docket Entry No. 386, Exhibit B, at 15-16; Docket Entries Nos. 13-14 on the District Court Action.

In addition to the Current Objection, an Objection to the Applications following the January Hearing was filed by the Chapter 11 Trustee.  Docket Entry No. 387 (the "Chapter 11 Trustee Objection").  This Objection argues that Winterhalter should simply be denied all fees because, in sum, the Firm's "services . . .  were aimed throughout this Case to benefit the interests of Union One, Archway and Alliance, et al. - - - whom [Winterhalter] also represented and/or who were paying [the Firm's] fees."  Id. at 12.  The Chapter 11 Trustee also complains that, following the entry of the Disqualification Order, Winterhalter "consistently has sought to oppose the actions of the Chapter 11 Trustee at the expense of its ostensible former client, the Debtor, and its estate."  Docket Entry No. 387 at 8-10.

Winterhalter responds that its participation in the District Court Action was "necessary to protect the Debtor."  Docket Entry No. 399 (the "Current

15

Response"). This, of course, is at complete odds with the Firm's assertion that its

participation occurred only *after* it was disqualified in the Debtor's bankruptcy

case. 1/5 Tr. at 8. The Current Response reiterates Winterhalter's contention

that the Debtor's interests were aligned with those of its affiliates:

> While it is clear that [Union One] was a general unsecured creditor of
> the Debtor as of the commencement of the case, it is equally clear
> that the interests of the Debtor and [Union One] are not in conflict,
> but in fact are wholly uniform in interest. . . . The Lenders
> independent action in the Federal District Court against the co-
> borrower Union One involving matters directly related and integral to
> the Chapter 11 re-organizational process did not create a conflict
> with the interests of the Debtor. To suggest that an entity which is
> owned by the persons who own identical ownership to the entity
> which wholly owns the Debtor (NIP) would act in conflict of their own
> interest is illogical. The positions and interest are as similar as the
> right hand is to the left. Each acts to the mutual benefit of the person
> to whom they belong.

Current Response at 16-17. The Current Response also points out that the

Debtor was only billed for a total of one hour of work regarding the District Court

Action. Id. at 15. The remainder of the Firm's work on this matter, valued at

$1,430 (and unpaid as of May 10, 2010) was separately billed to Union One. Id.

at 16; Exhibit 12.

The Court heard further argument and testimony on this matter on

February 22, 2011 (the "February Hearing"). At the February Hearing,

Winterhalter asserted that its representation of Union One did not amount to a

*material* conflict, because the Firm had "little involvement" in the District Court

Action and the time involved was only worth $1,400. 2/22 Tr. at 28-29.

16

Winterhalter reiterated its contention that "Union One and the Harris Agency have similar interests . . . the membership interests are identical." Id. at 30-31.

## II. DISCUSSION

Following the February Hearing, the matters of Winterhalter's First and Second Fee Applications were taken under advisement. After reviewing the history of this case, the pleadings, the transcripts, and the relevant case and statutory law, the Court concludes, for reasons discussed below, that Winterhalter must be disqualified as counsel in this case as of March 10, 2009, and that its fees must be denied and disgorged accordingly.

**A. Applicable Law**

### 1. Standard for Determining a Conflict of Interest

The terms upon which an attorney or other professional may be employed by a debtor are set forth in Section 327 of the Code, which provides, in relevant portion:

> [T]he trustee, with the court's approval, may employ one or more . . . professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons . . . a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

17

11 U.S.C. § 327(a)-(c) (emphasis added).[19]  The Code defines a "disinterested

person" as one who "does not have an interest materially adverse to the interest

of the estate or any class of creditors or equity security holders, by reason of any

direct or indirect relationship to, connection with, or interest in, the debtor, or for

any other reason."  11 U.S.C. § 101(14)(c).  An "adverse interest," in turn, is

usually defined to mean "any economic interest that would tend to lessen the

value of the bankruptcy or that would create either an actual or potential dispute

in which the estate is a rival claimant."  In re eToys, Inc., 331 B.R. 176, 189

(Bankr. D. Del. 2005) (citations omitted).  See also In re 22 Acquisition Corp.,

2004 WL 870813, at *3 (E.D. Pa. Mar. 23, 2004); In re Raymond Professional

Group, Inc., 421 B.R. 891, 901 (Bankr. N.D. Ill. 2009) ("Attorneys represent an

adverse interest when they serve as an attorney for any party holding an adverse

interest") (citation omitted).

    The term "actual conflict of interest," on the other hand, is defined largely

on a case-by-case basis -- by examining the specifics of the facts of a given

situation.  In re BH&P Inc., 949 F.2d 1300, 1315 (3d Cir. 1991) (upholding finding

of an actual conflict of interest where there was "the possibility that the parties

would favor one estate over the other in their attempt to serve all of them").  The

law in the Third Circuit is that "[s]ection 327[a] presents a per se bar to the

---

[19] Section 327 applies to a debtor-in-possession in addition to a bankruptcy trustee.  United
States Trustee v. Price Waterhouse, 19 F.3d 138, 142 (3d Cir. 1994).

appointment of a law firm with an actual conflict, and gives the district court wide

discretion in deciding whether to approve the appointment of a law firm with a

potential conflict." In re Marvel Entertainment Group, Inc., 140 F.3d 463, 477 (3d

Cir. 1998) (citing In re BH&P Inc., 949 F.2d 1300, 1308 (3d Cir. 1991));[20] In re

Pillowtex, Inc. 304 F.3d 246, 252 (3d Cir. 2002).  See also In re Congoleum

Corp., 426 F.3d 675 (3d Cir. 2005).

   A conflict is deemed actual, and *per se* disqualifying, if "it is likely that a

professional will be placed in a position permitting it to favor one interest over an

impermissibly conflicting interest."  In re Pillowtex, Inc., 304 F.3d 246, 251 (3d Cir.

2002) (citation omitted).  Usually, professionals with a potential conflict[21] of

interest also are not approved for employment. In re 22 Acquisition Corp., 2004

WL 870813, at *3 (E.D. Pa. Mar. 23, 2004).  Because the parameters of section

327 insure that employees of an estate do not have divided loyalties, they are

strictly enforced.  In re Raymond Professional Group, Inc., 421 B.R. 891, 902

(Bankr. N.D. Ill. 2009).

   Bankruptcy Judges have a great deal of discretion both in deciding the terms

and conditions of the employment of professionals and in determining whether or

not a conflict of interest exists.  In re BH&P Inc., 949 F.2d 1300, 1313-16 (3d Cir.

---

[20] The Marvel court held that it was beyond a court's exercise of discretion to disqualify a law firm based solely on the "appearance of a conflict."  140 F.3d at 478.

[21] A conflict is "potential" when the competition "does not presently exist, but may become active if certain contingencies arise."  In re Raymond Professional Group, Inc., 421 B.R. 891, 902 (Bankr. N.D. Ill. 2009) (citation omitted).

1991).  See also In re 22 Acquisition Corp., 2004 WL 870813, at *3 (E.D. Pa. Mar.

23, 2004) ("[T]he Third Circuit has held that the bankruptcy court is better suited to

decide whether disqualification is appropriate").  Once a material conflict has been

detected, an attorney may be disqualified or disallowed fees.  In re BH&P Inc., 949

F.2d 1300, 1313 (3d Cir. 1991).

### 2. Standard with Regard to Disclosure Requirements

The provisions of Section 327(a) are fleshed out by Bankruptcy Rule

2014(a), which requires attorneys filing an application for employment by the

estate to accompany the application with "a verified statement of the person to be

employed setting forth the person's connections with the debtor, creditors, any

other party in interest, their respective attorneys and accountants, the United

States trustee, or any person employed in the office of the United States trust-

ee."  Fed. R. Bankr. P. 2014(a) (emphasis added).  Full, complete, and timely

disclosure by an attorney proposing to represent a debtor "goes to the heart of

the integrity of the bankruptcy system;" a court cannot effectively determine an

attorney's eligibility for employment pursuant to section 327 or "root out

impermissible conflicts of interest" without proper disclosure on the part of an

applicant.  In re eToys, Inc., 331 B.R. 176, 187-89 (Bankr. D. Del. 2005) (citations

omitted) (holding that a law firm representing the Debtor which failed to disclose a

conflict would be sanctioned with disgorgement of fees).  Rule 2014 firmly places

the burden of searching for and bringing to light potential conflicts of interest on

the applicant for employment.  In re BH&P Inc., 949 F.2d 1300, 1317 (3d Cir.

1991) ("It is not . . . the obligation of the bankruptcy court to search the record for possible conflicts of interest").

It is well established that the disclosure requirements are not discretionary; that is, "[t]he professional cannot pick and choose which connections to disclose." In re Molten Metal Tech., Inc., 289 B.R. 505, 511 (Bankr. D. Mass. 2003). See also In re Source Enters., Inc., 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008) ("The term 'connections' is broad and is strictly construed for purposes of Bankruptcy Rule 2014 . . . The existence of an arguable conflict must be disclosed if only to be explained away") (internal citations and quotations omitted); In re Hot Tin Roof, Inc., 205 B.R. 1000, 1003 (1st Cir. BAP 1997) ("The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest. . . . They cannot pick and choose which connections are irrelevant or trivial") (internal citations and quotations omitted).

Most importantly, the duty to disclose does not end once the Rule 2014 Verified Statement has been filed; rather, there is an ongoing duty of counsel to inform the court of its connections and potential conflicts. In re eToys, Inc., 331 B.R. 176, 190 (Bankr. D. Del. 2005) ("If a conflict arises after attorneys are employed by the debtor-in-possession, such conflict must be disclosed to the court and the court must immediately disqualify the attorney") (citations omitted). Lawyers who do not proceed carefully under the requirements of Rule 2014 do so

21

at their own risk.  Failure to disclose relevant connections is considered so

serious that it is an independent basis on which to sanction an attorney and deny

compensation.  <u>In re eToys, Inc.</u>, 331 B.R. 176, 190 (Bankr. D. Del. 2005); <u>In re</u>

<u>Frascella Enterprises, Inc.</u>, 2006 WL 1530256, at *4 (Bankr. E.D. Pa. Apr. 12,

2006); <u>In re Ressler Hardwoods & Flooring, Inc.</u>, 2010 WL 2342497, at *6 (Bankr.

M.D. Pa. June 8, 2010).  Bankruptcy courts are given "broad and inherent

authority to deny and disgorge compensation of attorneys who fail to satisfy the

disclosure requirements of the Code and Rules."  <u>In re Ramelah</u>, 2008 Bankr.

LEXIS 3652, at *24 (Bankr. E.D. Pa. Oct. 14, 2008), <u>aff'd</u> <u>Leinbach v. Reigle (In</u>

<u>re Ramelah)</u>, 2009 U.S. Dist. LEXIS 38155 (E.D. PA. May 4, 2009).

## B. Determination of the Matter Before the Court

Applying the above law to the facts at hand, the Court finds that

Winterhalter had an actual conflict of interest as of March 10, 2009, the date on

which it entered an appearance in District Court on behalf of Union One, less

than two months after the Debtor filed this case.  In addition, consideration of

applicable law leaves little doubt that the Firm's failure to disclose its

representation of and connection to yet a second creditor of the Debtor is a

serious infraction which warrants sanction.  The third portion of this discussion

will provide for those sanctions, and in turn directly address the actual matter

before the court, namely how much the Firm will be compensated for the work as

described in the Applications (and, in turn, how much of the Firm's fees already received must be disgorged).

### 1. Winterhalter had a Conflict of Interest as of March 10, 2009

The Firm's simultaneous representation of Union One - a creditor and co-obligor of Harris - and the Debtor created an actual conflict of interest as of March 10, 2009, the date that Winterhalter entered its appearance in District Court on behalf of Union One.  As counsel to both the Debtor and Union One, Winterhalter entered into a host of conflicts, both actual and potential.  The Firm could not be an effective and loyal advocate for both of these clients at the same time because their interests, contrary to the assertion of Winterhalter, are *not* identical.  First, while it was certainly in Union One's interest to have a competent defense in the District Court action, such was not necessarily in the Debtor's best interest because Harris could actually have benefitted from a successful suit against Union One.  If Union One had been found liable for and responsible to pay the debt for which it is a co-obligor, the Debtor would have had a related party with whom to negotiate a plan, rather than only the Bankruptcy Consortium.

Winterhalter's representation of both Union One and the Debtor also created an actual conflict of interest because it prevented the Firm from having - as it should - an undivided loyalty to Harris and from taking steps that would benefit the Debtor's interests.  As counsel to a bankruptcy estate, it is the job of a firm to maximize value for both the debtor *and* its creditors.  See In re N. John

23

<u>Cunzolo Assoc., Inc.</u>, 423 B.R. 735, 739 n.5 (Bankr. W.D. Pa. 2010) (citation

omitted) ("Even though the law firm acts as attorney for the debtor-in-possession,

it also has certain fiduciary duties to the estate, including ensuring that the rights

of the creditors are protected"); <u>In re Straughn</u>, 428 B.R. 618, 625-26 (Bankr.

W.D. Pa. 2010); <u>In re Raymond Professional Group, Inc.</u>, 421 B.R. 891, 903

(Bankr. N.D. Ill. 2009).  The duty of the Firm was not to the owners of the Harris

Agency and their related entities but rather to the Debtor and to those who would

benefit from maximizing the value of the bankruptcy estate.[22]  While the Affiliates

were creditors of the Debtor whose *ownership* interests may, at times, have been

aligned with the Debtor's (though their overall interests were *not* the same), it is

important to note that there are other creditors of Harris, unrelated and unaligned

with either the Debtor or the Affiliates.  The Firm's loyalties were divided because

it would have to choose either between what was best for the estate - all creditors

included - or between remaining loyal to the interests of the Debtor's owners.

This division created an actual conflict of interest.

An actual conflict was also created by Winterhalter's representation of

Union One due to the fact that the Consortium Banks in the District Court Action

sought to enjoin Union One from contacting clients of the Debtor.  Here, again,

the interests of Harris and Union One diverge.  It is in Harris' interests to maintain

---

[22] This does not mean that it is acceptable for Winterhalter to represent a creditor (Union One).
The duty of debtor's counsel is to represent the interests of *all* creditors, not to prefer the interests of one
creditor over all others'.

its clients without interference.  Winterhalter's representing these competing

interests at the same time is a violation of its duties to the Debtor.  See In re

Straughn, 428 B.R. 618, 628 (Bankr. W.D. Pa. 2010) ("Where circumstances are

presented that interfere with counsel's exercise of independent judgment on

behalf of client and creditors, the wise choice is not to assume a dual

representation relationship").

Further, that Union One is both a creditor and a co-obligor of the Debtor

created a conflict of interest.[23]  The fact that the Debtor owes Union One

$180,000, combined with the two companies' competing interests over their joint

debt, shows not only that the Harris Agency and Union One do not have identical

interests, but also that the Firm was representing an interest adverse to the

Debtor's.  The Court finds the case of In re Straughn, 428 B.R. 618 (Bankr. W.D.

Pa. 2010) instructive.  In Straughn, a law firm was disqualified as counsel to two

related debtors - a corporation and its principal - due to a conflict of interest.

Straughn, the individual Chapter 11 debtor and the corporation's (J.T.) President

and Secretary, was also a creditor of the company and a codebtor or guarantor

on the majority of the company's obligations.  428 B.R. at 622.  The Straughn

court analyzed the situation as follows, in determining that the proposed counsel

had an actual conflict pursuant to Third Circuit law:

---

[23] Representation of a creditor does not *per se* create a conflict of interest pursuant to 11 U.S.C.
§ 327(c); the court, however, shall disapprove such employment if there is an "actual conflict of interest."

> Perhaps most telling is that Straughn is a creditor of J.T.  Where one
> estate is indebted to the other, there exist two groups of creditors
> which have conflicting claims and payment for one group is
> necessarily at the expense of the other . . . Therefore, the Court finds
> in this case that because one estate is indebted to the other, there is
> an actual conflict of interest which prohibits the dual representation
> of both Debtors by Proposed Counsel.

In re Straughn, 428 B.R. 618, 625-26 (Bankr. W.D. Pa. 2010) (internal quotations

and citations omitted).

Beyond this *actual* conflict, the court held that a *potential* conflict was

created by counsel simultaneously representing and advising two parties who

were co-obligors on a joint debt.  Straughn , 428 B.R. at 626.  See also In re

Briarwood Capital, LLC, 2010 WL 2884944 (Bankr. S.D. Ca. July 20, 2010)

(disqualifying firm for dual representation due to a conflict of interest); In re

Premier Farms, L.C., 305 B.R. 717 (Bankr. N. D. Iowa 2003) (dual representation

of debtor and creditor created conflict of interest and meant that law firm was

biased); In re N. John Cunzolo Assoc., Inc., 423 B.R. 735, 740 (Bankr. W.D. Pa.

2010) (noting that dual representation is frowned upon because it prevents

counsel for the debtor from diligently and effectively searching for "causes of

action that may yield a recovery for the estate") (citation omitted).  Here, the

potential conflict created by the fact that Union One was a creditor of the Debtor

was heightened by Union One's guarantee of Winterhalter's fees while it was

employed by the Debtor.  3/10 Tr. at 30-31.  Because the relationship between

the Debtor and Union one was so tangled, the Firm's involvement in any matter

26

for Union One during the time that it was representing the Debtor - much less a

matter that directly impacted Harris - was not advisable.

Disqualifying a debtor's counsel due to a conflict of interest is a serious

matter, with important consequences.  The Court has, therefore, carefully

considered the arguments of Winterhalter in response to the allegations of the

UST and Chapter 11 Trustee.  Upon reflection on these arguments, particularly in

light of the events leading to and issuance of the Disqualification Order last year,

the Court is unfortunately left to conclude that Winterhalter either does not take

the matter of conflicts seriously, or does not understand this area of the law.  For

example, Paul Winterhalter, the Firm's principal, initially testified that the Firm

represented Union One only *after* the issuance of the Disqualification Order was

entered on May 10, 2010, i.e. a full year and two months after the representation

actually began on March 10, 2009.  1/5 Tr. at 8.  Such a mistake - erring about

the timing of a potential dual representation by 14 months - does not indicate that

the Firm is diligent about avoiding conflicts.

Winterhalter protests, as it did prior to the issuance of the Disqualification

Order, that no conflict of interest exists because the interests of these two parties

- Harris and Union One - are identical.  See e.g. Current Response at 16-17 ("to

suggest that an entity which is owned by the persons who own identical

ownership to the entity which wholly owns the Debtor (NIP) would act in conflict of

their own interest is illogical.  The positions and interest are as similar as the right

27

hand is to the left.  Each acts to the mutual benefit of the person to whom they

belong").[24]  For the reasons discussed above, namely that the interests of Union

One and Harris are not the same - and may even be considered adverse - this

argument must fail.  And the fact that the members of the two entities overlap, as

the Firm emphasizes, means merely that the same group of individuals would

prefer each company to succeed, not that there will never arise a conflict leading

to their preference of one over another.  See In re Frascella Enterprises, Inc.,

2006 WL 1530256, at *7 (Bankr. E.D. Pa. Apr. 12, 2006) (rejecting law firm's

argument that it could represent both the Debtor and its principals because they

had a "community of interest").  Indeed, if destruction of one entity is necessary

for the survival of another entity, the owners of both may gladly sacrifice the

entity.

          Further, the argument that the representation of Union One did not involve

enough time or money to create a conflict of interest is unavailing.[25]  See 1/5 Tr.

---

[24] Winterhalter at times seems to contend that it was actually representing *Harris'* interests in the District Court Action.  See 1/5 Tr. at 11 (describing the Debtor as an "integral party" to the Action).  This argument is flawed for two reasons.  First, it might come as a surprise to Union One, who hired the Firm as counsel and was being billed for the services, that Winterhalter was actually representing someone else in the District Court Action.  Second, if Winterhalter simply had the Debtor's interests in mind, it could have sought a stay of the District Court Action by the Bankruptcy Court pursuant to section 105 of the Code.  Indeed, the failure to take this action on the part of the Firm may suggest that Winterhalter was aware of the conflict of interest.

[25] Winterhalter likewise argues that little happened in the District Court action after the date that it entered its appearance and emphasizes that the case was not particularly active.  The Court, on the other hand, wonders whether Winterhalter had a connection and or loyalty to Union One prior to the entry of the Firm's appearance in District Court.  Although no evidence has been presented with regard to this question, and thus there is no reason to find a conflict of interest prior to March 10, 2009, the Court notes that the March 10th date is simply the earliest the conflict is actually known to have occurred (there being concrete evidence of it on that date).

at 28-29.  Winterhalter seems to have a misperception of the law in this area, emphasizing at the January Hearing that what it perceives as its minor participation in the Union One representation did not "amount to a material conflict."  Id. at 28, 29.  The Firm has cited no law supporting the proposition that a conflict of interest is acceptable as long as not too much money, time, or investment of interest is involved.  The Third Circuit holds to the contrary; while a conflict with creditors must be "material" in order to warrant disqualification of an attorney, "a professional may not have *any* conflict with the estate."  In re Pillowtex, Inc. 304 F.3d 246, 252 n.4 (3d Cir. 2002) (emphasis in original).[26]  See also In re N. John Cunzolo Assoc., Inc., 423 B.R. 735, 739 (Bankr. W.D. Pa. 2010) (noting that courts have held that professionals should be disqualified who have "an interest that would even faintly color the independence and impartial attitude required by the Code") (internal quotations and citations omitted).  As soon as a professional's loyalties are actually improperly divided, it is irrelevant how much they are divided.  The issue is qualitative, not quantitative; bankruptcy counsel simply cannot have or represent interests adverse to the estate. Winterhalter must, therefore, be disqualified as of March 10, 2009, the date on which the Entry of Appearance was filed.

---

[26] As discussed earlier, the standard in the Third Circuit is that counsel must be disqualified if it maintains an actual conflict of interest.  See Section II.A.1, *supra*.  It is possible that in arguing that the Firm had no "material" conflict that Winterhalter meant to suggest that it did not have an *actual* conflict of interest.  However, when the argument by the Firm is fleshed out, one understands that what it thinks is really at issue is not adverse interests per se but *amounts* of time and money.

### 2. Sanctions are Also Appropriate Due to Winterhalter's Failure to Disclose

As Judge Sigmund said in In re Frascella Enterprises, Inc., 2006 WL 1530256, at *5 (Bankr. E.D. Pa. Apr. 12, 2006), when finding that an attorney failed to meet the essential disclosure requirements, counsel "appears to have lost sight of [the] fundamental principles."[27]   Unfortunately, the same is true here. The law regarding an applicant's duty to disclose pursuant to Bankruptcy Rule 2014, outlined above, makes it clear that attorneys must give full, updated, and timely disclosure to the court, and that the burden is on professionals to provide complete information, not on the court or creditors to dig for such knowledge.  In this case, once allegations of a conflict of interest arose (in January, 2010), Winterhalter's already strict duty to disclose was heightened.  That is, aware that a conflict of interest may have existed due its receipt of payments from Archway and Alliance, it became imperative for Winterhalter to make absolutely certain that all connections per Rule 2014(a) were disclosed to the Court in early 2010, both because this is an ongoing duty as an employed professional of the estate and also because the Court would need knowledge of any and all of Winterhalter's connections in order to make an informed decision on whether the Firm was qualified to continue to represent the Debtor.

---

[27] In Frascella, counsel filed a "bare bones" application for employment, disclosing nearly no facts.  2006 WL 1530256, at *1.  After an Objection was filed, counsel disclosed supplemental facts regarding prior related employment of both the debtor, related parties, and creditors, as well as the receipt of pre-petition payments.  Id. at *1-2.  Upon consideration, the court denied the firm's application to employ, holding both that counsel had failed to timely disclose according to the rules and that the firm had a conflict of interest.  Id. at *5-7.

Full disclosure was, however, never provided by Winterhalter.  Rather, the

Firm's representation of Union One was disclosed in a filing by the UST in July,

2010.  There is little reason to believe that, in the absence of diligence on the part

of the UST and the Debtor's creditors, full disclosure of the Firm's connections

ever would have been made by Winterhalter.[28]  See In re Frascella Enterprises,

Inc., 2006 WL 1530256, at *6 (Bankr. E.D. Pa. Apr. 12, 2006) ("Had the creditors

been less persistent and less knowledgeable about the affairs of the Debtor . . . I

am convinced that the information . . . might have never come to light").

Winterhalter's lack of disclosure is disturbing for at least three reasons.  First,

there are important policy reasons for the disclosure requirements.  These rules

not only keep professionals honest, but the court needs the disclosed information

so that it can determine whether counsel is disinterested and eligible to be

employed by the estate.  In a case like this, which has been highly contentious

from the beginning, full disclosure would have meant a little less fighting and lot

less spent on lawyers' fees.[29]

---

[28] The affidavit accompanying the Verified Statement never was amended or corrected; it states: "to the best of my knowledge, information, and belief, neither I, nor any member of my firm has any connection with any party in interest . . . ."  Docket Entry No. 6-1 at 1, ¶3.

[29] The disclosure difficulties in this case have increased the already contentious nature of the proceedings.  For example, on December 21, 2009, a lengthy hearing was held regarding, among other matters, the issue of the Debtor's failure to report client trust accounts.  See Docket Entry No. 156.  While the Court was at first inclined to give Winterhalter the benefit of the doubt with regard to its failure to provide full and complete information to creditors, the UST, and the Court (as it did with regard to both the trust account issue and with its issuance of the relatively lenient sanction in the Disqualification Order), transgressions by Winterhalter have mounted over the course of this case, leaving the Court with the distinct impression that Winterhalter at best believes that it can determine with what Rules and Code sections it must comply.

31

Second, lack of disclosure may indicate and can amount to a lack of candor to the tribunal.  This happened here.  For example, Winterhalter stated in the Post-Hearing Brief  "I do not represent any party other than the Debtor."  Docket Entry No. 207 at 7 (filed March 22, 2010).  This statement was made during a time when Winterhalter was representing both the Debtor in this court and Union One in the District Court.  Similarly, at the March Hearing, Mr. Winterhalter stated "I, my firm, have no connection with Archway, Alliance the Office of the United States Trustee, *or anyone else involved in this case*."  3/10 Tr. at 70 (emphasis added). This statement would no doubt lead the Court to believe that the Firm had no involvement with any creditors or other parties in interest when, in fact, Winterhalter at the time had a clear connection both to Union One, whom it was representing in the District Court Action, and to the Affiliates.  Another misleading statement provided by Winterhalter is the indication in the First Fee Application that only $5,138.25 should be credited against any fees awarded to the Firm. Docket Entry No. 158 at 5.  However, Winterhalter at that time had received some $57,893.11 from Archway and Alliance for its services to the Debtor.  Docket Entry No. 178 at 5.

This leads us to the third essential problem with the Firm's lack of disclosure; it is apparent from the briefs filed and hearings regarding this matter that Winterhalter has not fully considered the critical law with regard to the term "connections" in Bankruptcy Rule 2014(a).  Take, for example, Winterhalter's

statement in the Post-Hearing Brief that "[t]here is absolutely no guidance on

what degree or level of connection need be disclosed under BR 2014(a)."  Docket

Entry No. 207 at 8.  Given the many cases cited in section II.A.2, above - which

provides just a small sampling of the extensive body of law on the term

"connection" as related to the disclosure requirements in Bankruptcy Rule

2014(a) - Winterhalter's statement that it went looking for guidance on what to

disclose and found insufficient information is baffling.  Yet this statement is not an

isolated one; Winterhalter has also asserted that

> The term connection is a rather innocuous standard.  I
> consider many of the attorneys who regularly practice in the Office of
> the United States Trustee . . . as my friends, if not my colleagues.
> Certainly they are professional acquaintances.  Do such represent a
> connection warranting disclosure in a verified statement and deserve
> disqualification and disgorgement if not disclosed?

Docket Entry No. 196 at 4.  Winterhalter's failure to disclose and corresponding

lack of understanding of the principles of conflicts law is surprising given that the

Firm is not comprised of new or inexperienced bankruptcy counsel.  Indeed, the

Firm has a substantial and long-lasting practice representing debtors, including

involvement in more than 30 cases currently pending in this court.

Both Winterhalter's failure to disclose its connection to and representation

of Union One and the Firm's actual conflict of interest created by that

representation cause the Court to conclude that Winterhalter must be disqualified

as counsel to the Debtor as of March 10, 2009 (rather than the previous date of

May 10, 2010, as provided in the Disqualification Order), and that the Firm's fees

must be denied accordingly (as detailed below).  See e.g., In re Marvel

Entertainment Group, Inc., 140 F.3d 463, 477 (3d Cir. 1998).  The Court is aware

that disqualification of the Firm as of this earlier date may be considered severe,[30]

yet such a sanction is appropriate when one considers that the Code, Rules and

orders of this Court were continually flouted in the course of this case.  In light of

these facts, and the discussion above, disqualification as of the date that the Firm

filed its appearance on behalf of Union One in District Court is perhaps the only

means by which Winterhalter will be brought to attention on these most important

matters.

### 3. Disgorgement: Where to and How Much?

Given that Winterhalter is disqualified as counsel to the Debtor as of

March 10, 2009, all fees as of and after this date will not be allowed.  See 11

U.S.C. § 328(c); U.S. Trustee v. Price Waterhouse, 19 F.3d 138, 142 (3d Cir.

1994).  The Court calculates the fees accrued up to and including March 9, 2009,

per the First Fee Application to be $39,053.25.  The expenses accrued during this

period are $1,293.67.[31]  This is the total amount of fees and expenses that will be

allowed to Winterhalter for its work on this Chapter 11 case and represents a

---

[30] At the same time, it would be within the Court's discretion and reasonable under the circumstances simply to deny all fees to Winterhalter.  The Court will not choose to exercise its discretion in this way, in part because it is mindful that the Firm is a small one and the sanctions as imposed will have a significant impact.

[31] This figure does not include amounts sought for legal research; these expenses were waived by Winterhalter as of January 5, 2011.

reduction in fees of $136,980 and $633.83 in expenses from what is requested in

the Applications.[32]

Although Winterhalter will be allowed compensation for fees and expenses

for its work through (and including) March 9, 2009, because it has already

received payments totaling $77,893.11 from Archway and Alliance, the Firm will

have to disgorge $37,546.19. The Court calculates that 52% of the $77,893.11

was received from Archway and 48% received from Alliance;[33] therefore,

$19,524.02 (52%) of the disgorged funds must be returned to Archway and

$18,022.17 (48%) must be returned to Alliance.

---

[32] The Court has carefully reviewed both Fee Applications and has two additional concerns
regarding the form and content of the Firm's billing. First, Winterhalter regularly (though not always) bills
in quarter-hours, sometimes for activities which likely did not take 15 minutes. For example, on
January 22, 2009, Paul J. Winterhalter, principal at the Firm, billed .25 hours for sending an e-mail to
Kevin Kelly "requesting he provide update on P/R numbers." First Fee Application, Exhibit A at 1.
Similarly, on February 25, 2009, Mr. Winterhalter billed .25 hours for sending an "e-mail to D. Klauder,
Esq. confirming revenues will cover difference." Id. at 15. The practice of billing in quarter-hours is
generally frowned on because it "suggests the opportunity for padding on short tasks." In re Saint
Joseph's Hosp., 102 B.R. 416, 418 (Bankr. E.D. Pa. 1989); see also In re Jefsaba, Inc., 172 B.R. 786, 801
(Bankr. E.D. Pa. 1994) ("all time should be recorded in increments of one-tenth of one hour or six minutes
. . . minimum charges of .10-hour increments more fairly reflect actual time involved, than do quarter hour
segments.") (internal citation and quotations omitted).
    Second, the Court is mystified that the Firm finds it appropriate to bill the Debtor for a total of 53.9
hours, or $15,970, for work performed in connection with defending itself (unsuccessfully) on the UST's
Motion to Disqualify. Docket Entry No. 236-2, Exhibit B at 1. The Second Application was filed on
May 20, 2010, or 10 days after the Order disqualifying Winterhalter for a conflict of interest was issued. It
is, therefore, beyond the Court's comprehension how the Firm's work on the Motion to Disqualify could
have benefitted the estate. See In re Jefsaba, Inc., 172 B.R. 786, 800 (Bankr. E.D. Pa. 1994) ("we expect
that professionals seeking compensation from the estate will in the first instance ask themselves whether
a non-bankruptcy client applying a cost/benefit analysis would undertake the contemplated course of
action"). Under no circumstances, and certainly not once its counsel has been disqualified for a conflict of
interest and the matter is not under appeal, should a client be asked to pay for work related to its
attorneys' violation of the Code and Rules.

[33] According to the Amended Verified Statement, $40,393.11 of the $77,893.11 was paid by
Archway and $37,500 was paid by Alliance. Docket Entry No. 178, Exhibit 1.

The UST argues that the fees paid to Winterhalter by Archway and Alliance are now property of the estate and should be returned to the Debtor.  Docket Entry No. 236 at 7-8.  This relief will not be granted for two reasons.  First, the Court already specifically denied such a request by the UST in footnote 18 of the Disqualification Order.  Second, (as discussed in that footnote), the UST relies on a case inapposite to this, In re W.T. Mayfield Sons Trucking Co., Inc., 225 B.R. 818 (Bankr. N.D. Ga. 1998), for the proposition that disgorged fees should be returned to the estate.  Mayfield dealt with a situation in which transfers were made by a subsidiary for the benefit of the debtor and the payments were made with regard to the debtor's ownership of stock in the subsidiary.  In this case, neither Archway, Alliance, nor Union One is a subsidiary of the Debtor.  They are, rather, only related entities and unsecured creditors.  Mayfield, therefore, is not persuasive authority and the Court finds no reason to reconsider its decision that the disgorged funds should be returned to Archway and Alliance, not to the estate.

### 4. Continuing Legal Education Requirement

Given the seriousness and ongoing nature of the infractions at issue here, the Court does not consider the above monetary penalty to be a sufficient sanction.  Therefore, every attorney at the Winterhalter Firm will be ordered to attend and complete, within nine months from the date of this Opinion, six hours

of Pennsylvania continuing legal education dealing specifically with conflicts of
interest.

## III. Summary

For the reasons set forth above, Winterhalter is disqualified as counsel to
the Debtor due to an actual conflict of interest as of March 10, 2009 and also due
to its failure to disclose its connections with regard to this conflict.  Because the
Firm is disqualified, the allowed fees will be reduced to $39,053.25 and the
allowed expenses will be reduced to $1,293.67.  Winterhalter must disgorge
$19,524.02 of the $77,893.11 already received to Archway and $18,022.17 to
Alliance.  The attorneys at the Firm shall be ordered to attend six hours of
conflicts of interest continuing legal education.  An appropriate Order will follow.


Dated:  June 2, 2011.                    _____
                                         JEAN K. FITZSIMON
                                         United States Bankruptcy Judge

37