IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| THE HARRIS AGENCY, LLC, Debtors. | : : : | BANKRUPTCY NO. 09-10384 |
| PAUL J. WINTERHALTER, P.C. Appellant, | : : : | CIVIL ACTION |
| v. | : : | NO. 11-4525 |
| OFFICE OF THE UNITED STATES TRUSTEE, et al., Appellees. | : : : | |

FILED
NOV 17 2011
Anita B. Brody, Judge
By _____ Dep. Clerk

November 17, 2011                                            Anita B. Brody, J.

## MEMORANDUM

Appellant Paul J. Winterhalter, P.C. appeals the final order of the United States Bankruptcy Court for the Eastern District of Pennsylvania disqualifying Appellant as counsel to the Debtor, The Harris Agency, LLC, as of March 10, 2009, partially disallowing fees and expenses sought by Appellant, and mandating disgorgement of fees received in excess of the allowable amount. I exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). For the reasons set forth below, I will affirm the bankruptcy court's order.

## I. BACKGROUND

1

### A. History of the Debtor and Its Affiliates

The Harris Agency, LLC ("Harris" or "Debtor") is an insurance company that was formed on July 1, 2005 by Nevada Investment Partners, LLC ("NIP"). The membership interests in NIP are held by Eric K. Bossard, Randall Siko, Debra Agnew, and Fred Milbert (collectively, the "Principals"). These individuals, or most of them, have also formed the following entities that are related to the Debtor: Alliance Insurance Services, LLC ("Alliance"), Archway Insurance Services, LLC ("Archway"), and Union One Insurance Group, LLC ("Union One").[1]

In 2007, NIP negotiated a deal to purchase for Harris a book of business from Brown & Brown Insurance of Nevada, Inc. ("Brown & Brown"). NIP agreed to pay Brown & Brown $5,250,000 for the book of business, with half of the purchase price due upon signing the agreement, 25% due on January 23, 2008, and the final 25% due on July 23, 2008.

To make the first payment for the book of business, the Debtor, NIP, and Union One borrowed approximately $2.9 million on a secured basis. To make the second payment, Archway lent the Debtor and NIP approximately $1.3 million. The Debtor was unable to make the third payment to Brown & Brown because the volume of business was lower than expected.

During this time period, Alliance also lent the Debtor approximately $445,000 to help the Debtor cope with diminished cash flow and the need to maintain operating expenses. Additionally, Union One lent the Debtor approximately $180,000 for the same reason.

On December 3, 2008, Brown & Brown recorded a judgment against Harris in Nevada. This judgment precipitated Harris to file a Chapter 11 petition for bankruptcy on January 20, 2009.

---

[1] The same individuals own Union One and NIP, the entity which wholly owns the Debtor.

2

### B. The Appointment of Paul J. Winterhalter, P.C.

The same day that Harris filed a petition for bankruptcy, Paul J. Winterhalter, P.C. ("Winterhalter" or the "Firm") filed an Application for Employment of Counsel ("Application for Employment") pursuant to 11 U.S.C. § 327. Along with the application, a Verified Statement of Counsel in Support of Application to Employ Counsel for Debtor was submitted pursuant to Bankruptcy Rule 2014. The verified statement from Winterhalter stated that the Firm did not have "any connection with any party in interest," and that it did not "represent[] an interest adverse to the Debtor herein or this Estate . . . ." R. 9.

The bankruptcy court conditionally approved the Firm's Application for Employment. Following this order, Winterhalter filed a Disclosure of Compensation pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b). This disclosure revealed that the Firm had agreed to accept $50,000 for legal representation of the Debtor, and that it had already received a $23,200 retainer paid by Harris and Alliance. Furthermore, the disclosure noted that Alliance or its affiliates would be the source of future compensation.

### C. The Bankruptcy Court's First Disqualification Order

On January 7, 2010, Winterhalter filed its first interim application for compensation and reimbursement of expenses. In this application, the Firm sought payment for $113,515.75 in fees and $2,636.92 in expenses for the time period of January 20, 2009 through December 31, 2009. In response, Frederick Milbert and the United States Trustee (the "UST") objected to the fee application because Winterhalter had failed to disclose post-petition payments from third parties. Following these objections, Winterhalter filed an amended verified statement that disclosed, for the first time, that Winterhalter had received periodic payments since the

3

commencement of the bankruptcy case totaling $77, 893.11 from Archway and Alliance. Specifically, the Firm received $40,393.11 from Archway, and $37,500 from Alliance. In light of the amended verified statement, the UST filed a motion requesting disqualification of Winterhalter and seeking disgorgement of the Firm's fees.

On March 10, 2010, the bankruptcy court held a hearing on the first interim fee application and the motion to disqualify. At the hearing, it was revealed, for the first time, that the Debtor owed Archway approximately $1.3 million for a pre-petition loan. Additionally, a manager of both Archway and Alliance testified that the "family of companies" — Archway, Alliance, and Union One— had agreed to pay the Firm's legal fees for representing the Debtor. Furthermore, the manager testified that it was understood that the Debtor would repay Archway and Alliance for any payments they made to Winterhalter.

On May 10, 2010, the bankruptcy court issued an order immediately disqualifying Winterhalter from any further representation of the Debtor due to an actual conflict of interest. According to the court:

> Winterhalter's receipt of payments from Archway created an actual conflict of interest, at least, by the time the Plan was prepared, due to the following: (1) Archway is an unsecured creditor of the Debtor; (2) Archway was a proposed contributor to the Plan and would have been a 50% owner of the reorganized Debtor; (3) Archway is owed approximately $1.3 million by the Debtor on a pre-petition loan; (4) Archway has paid some of Winterhalter's fees; and (5) Mr. Agnew testified that Archway expected to be reimbursed by the Debtor for any payments made to the Debtor's counsel.

R. 27, p.10-11. Despite the UST's request, the court declined to disqualify Winterhalter from the inception of the case, and did not rule on the Firm's first interim fee application. No one appealed this disqualification order.

### D. The Bankruptcy Court's Second Disqualification Order

On May 20, 2010, Winterhalter filed a second interim fee application seeking $62,518.50 in fees and $1,383.08 in expenses for the time period of January 1, 2010 through May 10, 2010. Following this, The UST filed objections to both the first and second interim fee applications. A primary reason the UST objected to Winterhalter's fee requests was the discovery it made in the summer of 2010 that Winterhalter had entered its appearance as counsel for Union One in the United States District Court for the Eastern District of Pennsylvania in the matter of *Kendall State Bank, et al. v. Union One Insurance Group, LLC.* (Civil Case No. 09-494) on March 10, 2009. Winterhalter's simultaneous representation of Union One and the Debtor troubled the UST because Union One was a co-obligor on the $2.9 million dollar loan that Harris obtained to make the first payment on the book of business, and it was also an unsecured creditor of the Debtor since it had loaned Harris approximately $180,000 prior to its filing for bankruptcy.

The court held hearings on Winterhalter's fee applications on January 5, 2011 and February 22, 2011. It was confirmed at the hearing that the plaintiffs in the district court case were the Consortium Banks who had acquired the interest in the $2.9 million loan given to the Debtor to make the first payment on the Brown & Brown book of business. This loan had been guaranteed by the Debtor, NIP, and Union One. Because Union One was a co-guarantor of the $2.9 million loan, the Consortium Banks brought suit against Union One, seeking payment on the loan, as well as an injunction against Union One interfering with or contacting clients of the Debtor.

The hearings and related submissions revealed that, in addition to entering an appearance as counsel for Union One in the district court litigation, Winterhalter had filed a corporate

disclosure statement and two joint stipulations for an extension of time to file a responsive pleading to the complaint. Following these actions, the district court placed the case in civil suspense on June 18, 2009, the status in which the case remained until June 10, 2010, a month after the bankruptcy court first disqualified Winterhalter from representing the Debtor. In submissions to the court, Winterhalter explained that it had only done a minimal amount of work for Union One in the district court litigation. Specifically, Winterhalter stated that it had only sought one hour of compensation in its pending fee applications for time spent representing Union One. Additionally, it noted that it had only billed Union One $1,430.00 for work on the matter.

Following the hearings, the court entered a memorandum opinion and an order on June 3, 2011. In its opinion, the court concluded that Winterhalter had an actual conflict of interest as of March 10, 2009, the date it entered an appearance for Union One, a creditor and co-obligor of Harris. According to the court, "Winterhalter's representation of both Union One and the Debtor . . . created an actual conflict of interest because it prevented the Firm from having - as it should - an undivided loyalty to Harris and from taking steps that would benefit the Debtor's interests." R. 46, p.23. The court found that Winterhalter's representation of Union One "was not necessarily in the Debtor's best interest because Harris could actually have benefitted from a successful suit against Union One." R. 46, p.23. Specifically, the court found that an injunction against Union One would have been favorable for the Debtor because it was in the Debtor's best interest to maintain its clients without interference from Union One. Additionally, the court noted that if the district court had held Union One liable for the debt as a co-obligor this may have benefitted Harris by giving it another party to negotiate with in establishing a plan besides

6

the lenders. Because of its representation of Union One, the court found that Winterhalter's loyalties were divided between the Debtor's interests, which included the interests of all of its creditors, and the interests of the Debtor's owners. Furthermore, the court concluded that "[t]he fact that the Debtor owes Union One $180,000, combined with the two companies' competing interests over their joint debt, shows not only that Harris Agency and Union One do not have identical interests, but also that the Firm was representing an interest adverse to the Debtor's." R. 46, p.25. The court also noted that there was "a potential conflict of interest created by the fact that Union One was a creditor of the Debtor," and that this potential conflict "was heightened by Union One's guarantee of Winterhalter's fees while it was employed by the Debtor." R. 46, p.26.

Ultimately, the court held that Winterhalter's actual conflict of interest necessitated the Firm's disqualification as of March 10, 2009. Additionally, the court held that the Firm's March 10, 2009 disqualification was necessary because Winterhalter had failed, as required by Bankruptcy Rule 2014, to disclose its connections to and representation of Union One.

As a result of this disqualification, the court disallowed Winterhalter from recovering any fees or expenses incurred on or after March 10, 2009. The court held that the total amount allowed for fees through March 9, 2009 was $39,053.25, and the total amount allowed for expenses was $1,293.67. Because Winterhalter had already received payments totaling $77,893.11 from Archway and Alliance, the court ordered disgorgement of $37,546.19. Specifically, the Firm was to return $19,524.02 to Archway and $18,022.17 to Alliance. In addition to the monetary sanction, the court ordered every attorney at the Firm to complete six hours of Pennsylvania continuing legal education.

Although Winterhalter did not appeal the court's first order disqualifying the Firm, Winterhalter decided to appeal the court's second order disqualifying the Firm. Consequently, Winterhalter instituted the present action.

### E. Summary of the Key Connections Between the Debtor's Affiliates, the Debtor, and Winterhalter

For ease of reference, the following chart lists the Debtor's affiliates and summarizes their connections to the Debtor and to Winterhalter:

| Affiliate | Connections to the Debtor (Harris) | Connections to Winterhalter |
|---|---|---|
| **Alliance** | 1) Controlled by several of the same individuals (the Principals) who have membership interests in NIP, the entity that owns the Debtor.<br><br>2) Lent the Debtor approximately $445,000 in a pre-petition loan to help the Debtor maintain its operations. | 1) Agreed to pay Winterhalter's fees for representing the Debtor. Expected to be reimbursed by the Debtor for any payments made to Winterhalter on the Debtor's behalf.<br><br>2) Post-petition paid Winterhalter $37,500 for representing the Debtor. |
| **Archway** | 1) Owned by many of the same individuals (the Principals) who have membership interests in NIP, the entity that owns the Debtor.<br><br>2) Lent the Debtor approximately $1.3 million to make the second payment on the Brown & Brown book of business.<br><br>3) In the initial reorganization plan, Archway was a proposed contributor to the Plan and would have been a 50% owner of the reorganized Debtor. | 1) Agreed to pay Winterhalter's fees for representing the Debtor. Expected to be reimbursed by the Debtor for any payments made to Winterhalter on the Debtor's behalf.<br><br>2) Post-petition paid Winterhalter $40,393.11 for representing the Debtor. |
| **Union One** | 1) Owned by the same individuals | 1) Agreed to pay Winterhalter's fees |

8

| | | |
|---|---|---|
| | (the Principals) who have membership interests in NIP, the entity that owns the Debtor.<br><br>2) Lent the Debtor approximately $180,000 in a pre-petition loan to help the Debtor maintain its operations.<br><br>3) Along with the Debtor and NIP, Union One guaranteed the approximately $2.9 million loan that the Debtor took to make the first payment on the Brown & Brown book of business. | for representing the Debtor. Expected to be reimbursed by the Debtor for any payments made to Winterhalter on the Debtor's behalf.<br><br>2) Winterhalter entered its appearance as counsel to Union One on March 10, 2009 in the United States District Court for the Eastern District of Pennsylvania in the matter of *Kendall State Bank, et al. v. Union One Insurance Group, LLC*.<br><br>3) Winterhalter sought one hour of compensation from the Debtor for its representation of Union One in the district court litigation.<br><br>4) Winterhalter billed Union One for $1,430.00 for its representation of Union One in the district court litigation. |

## II. LEGAL STANDARD

The "vantage point [of the court of appeals] is identical to that of the district court" when reviewing a decision of the bankruptcy court. *In re BH & P Inc.*, 949 F.2d 1300, 1305-06 (3d Cir. 1991). In conducting an appellate review of a bankruptcy court's order, the district court applies a clearly erroneous standard of review to the bankruptcy court's factual findings and a de novo standard of review to its legal conclusions. *In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994). A bankruptcy court's decision to disqualify counsel and to disgorge attorney's fees is reviewed for abuse of discretion. *Geisenberg v. DeAngelis*, No. 10-1660, 2011 WL 4458779, at *3 (M.D. Pa. Sept. 23, 2011); *see also In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 470 (3d Cir. 1998); *BH & P*, 949 F.2d 1316-17. Likewise, a bankruptcy court's decision regarding fee

awards is reviewed for an abuse of discretion. *Ferrara & Hantman v. Alvarez (In re Engel)*, 124 F.3d 567, 571 (3d Cir. 1997). "An abuse of discretion exists where the . . . court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Int'l Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987).

## III. DISCUSSION

Winterhalter challenges the bankruptcy court's order on several grounds. First, Winterhalter challenges the Firm's disqualification as of March 10, 2009 by arguing that the simultaneous representation of the Debtor and Union One did not create a conflict of interest. The Firm next argues that even if a conflict of interest existed based on this dual representation, the bankruptcy court was barred by either res judicata, collateral estoppel, or the law of the case from altering the date of Winterhalter's disqualification, which was previously determined by the court to be May 10, 2010. Lastly, the Firm argues that even if its disqualification as of March 10, 2009 was proper, the court lacked the jurisdiction to mandate disgorgement of fees to entities other than the Debtor.

### A. Conflict of Interest

"A debtor in possession . . . may, with bankruptcy court approval, employ one or more attorneys to represent it and to assist it in fulfilling its duties." *In re Pillowtex, Inc.*, 304 F.3d 246, 250 (3d Cir. 2002) (citing 11 U.S.C. § 327). "[T]he power of a debtor in possession to employ . . . professionals is the same as that of a trustee. The extent of this power is specified by Section 327(a) . . . ." *U.S. Trustee v. Price Waterhouse*, 19 F.3d 138, 141 (3d Cir. 1994) (citations omitted). Section 327(a) provides that a court may approve the employment of attorneys only if they "do not hold or represent an interest adverse to the estate" and they are

"disinterested persons." 11 U.S.C. § 327(a). These two prohibitions on employment set forth two separate standards for disqualification. *Pillowtex*, 304 F.3d at 252 n.4. The first prohibits attorneys from holding or representing any "interest adverse to the estate." *Id.* The second prohibits attorneys who are not disinterested from providing representation. *Id.* As defined by the Bankruptcy Code, attorneys are disinterested if they "do[] not have an interest materially adverse to the interest of . . . any class of creditors or equity holders . . . ." 11 U.S.C. § 101(14)(c); *see Pillowtex*, 304 F.3d at 252 n.4. "Thus, a professional may not have *any* conflict with the estate, while a conflict with creditors must be 'material.'" *Pillowtex*, 304 F.3d at 252 n.4.

The Court of Appeals for the Third Circuit has interpreted § 327(a) "to impose[] a per se disqualification . . . of any attorney who has an actual conflict of interest"; to permit a court to exercise "its discretion . . . [to] disqualify an attorney who has a potential conflict of interest"; and to forbid a court from "disqualify[ing] an attorney on the appearance of conflict alone." *Marvel*, 140 F.3d at 476. While the term "actual conflict of interest" has not been defined in the Code, the Court of Appeals for the Third Circuit has explained that "a conflict is actual, and hence per se disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest." *Pillowtex*, 304 F.3d at 251. "Courts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists in light of the particular facts of each case." *BH & P*, 949 F.2d at 1315 (internal quotation marks omitted). Although a court may initially authorize the employment of counsel, it must disqualify counsel upon learning of an actual conflict, and it may exercise its discretion to remove counsel if there is a potential conflict. *See id.* at 1314-17.

11

In addition to disqualifying attorneys who have an actual or potential conflict,

> [T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 . . . if, at any time during such professional person's employment under section 327 . . . , such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c).

Here, the bankruptcy court determined that Winterhalter had an actual conflict of interest when it entered its appearance as counsel for Union One in *Kendall State Bank, et al. v. Union One Insurance Group, LLC.* because its representation of Union One created an interest adverse to the bankruptcy estate. The Firm makes several flawed arguments as to why its representation of Union One was not an actual conflict. Winterhalter repeatedly states that its representation of Union One does not merit disqualification because there was no material conflict due to the Firm's limited involvement and time spent on the district court litigation. However, this argument misstates the legal standard for disqualification under § 327(a). "[W]hile a conflict with creditors must be 'material,'" "a professional may not have *any* conflict with the estate . . . ." *Pillowtex*, 304 F.3d at 252 n.4. Thus, Winterhalter's materiality argument is unavailing.

Although Winterhalter acknowledges that the district court litigation "was unquestionably a matter directly related and integral to the Chapter 11 re-organizational process," the Firm argues that because Union One and Harris have "wholly uniform" interests there was no conflict of interest. Appellant's Br. 21. Winterhalter argues that the interests of Union One and Harris are completely uniform because they are owned by the same individuals, they are co-obligors on the $2.9 million loan, and Union One advanced money pre-petition to

Harris to help with operating deficiencies. Rather than establish that Union One and the Debtor have identical interests, these facts actually demonstrate the divergence of interests between the two entities. That Union One lent money to Harris pre-petition makes Union One a creditor of the Debtor, a relationship that § 327 recognizes has the potential to create a conflict of interest. As for their status as co-obligors on the $2.9 million loan, it is this exact reason that the bankruptcy court found Winterhalter's representation of Union One in the district court litigation to present an actual conflict of interest.

In the district court litigation, the Consortium Banks, who held the $2.9 million loan given to the Debtor, sought two things: (1) payment from Union One on the $2.9 million loan; and (2) an injunction against Union One to prevent it from interfering with or contacting Harris's clients. Winterhalter asserts that it was in the best interest of the Debtor for the Firm to represent Union One. However, this makes little sense given that a ruling in favor of the Consortium Banks may have been favorable to the Debtor because it would have provided the Debtor with another related entity to negotiate a plan with, and it would have prevented Union One from taking an asset of the Debtor's— Harris's clients.

Lastly, the identical ownership of Harris and Union One is best understood as one more piece of evidence that an actual conflict of interest did in fact exist. Although the interests of the principals of Union One and Harris certainly may have been aligned, i.e. in their desire to sacrifice Harris to ensure the survival of Union One, once Harris became a debtor in possession it no longer had the same interests as its Principals. This is because a debtor in possession owes "the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985).

"[A]mong the fiduciary obligations of a debtor-in-possession is the duty to protect and conserve property in its possession for the benefit of creditors." *Marvel*, 140 F.3d at 474 (internal quotation marks omitted). While it may have been in the best interest of the Principals to obtain Harris's clients and to have Harris assume sole responsibility for the loan, this agenda was not in the best interest of Harris, as the debtor in possession, because its goal was to maximize the value of its estate.

Winterhalter argues that there can be no conflict of interest because there is no proof of harm to the Debtor from the Firm's representation of Union One. However, proof of harm is not the test for the existence of a conflict. As the Court of Appeals for the Third Circuit has explained, "a conflict is actual, and hence per se disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest." *Pillowtex*, 304 F.3d at 251. When Winterhalter began its representation of Union One in the district court litigation, an action directly related to the Debtor's bankruptcy case, it likely placed itself in the position of favoring the interests of the Principals of Union One and Harris over the impermissibly conflicting interests of the Debtor. The bankruptcy court exercised sound discretion when it determined that an actual conflict of interest existed at the point Winterhalter entered its appearance as counsel to Union One in the district court litigation. Therefore, it properly disqualified Winterhalter from representing the Debtor as of March 10, 2009.[2] Additionally, it was well within the bankruptcy court's discretion to deny Winterhalter

---

[2] While I find that Winterhalter's representation of Union One in the district court litigation was an actual conflict of interest, I note that even if I were to conclude that this representation only created a potential conflict, it would still have been within the district court's discretion to disqualify the Firm. Additionally, I note that the bankruptcy court also found that even if the firm had not entered an appearance in the district court litigation, its representation of Union One

reimbursement of expenses and compensation for services rendered after the Firm's disqualification.³

### B. Res Judicata, Collateral Estoppel, and the Law of the Case

Winterhalter argues that even if an actual conflict of interest existed when the Firm entered an appearance as counsel for Union One, the bankruptcy court's order disqualifying the Firm as of May 10, 2010 precluded the court from later disqualifying the Firm as of March 10, 2009. Winterhalter relies on collateral estoppel, res judicata, and the law of the case as the basis for asserting that the May 10, 2010 disqualification order has preclusive effect. However, both

---

created a potential conflict of interest based on Union One's status as a creditor and its guarantee to pay the fees owed to Winterhalter for the Firm's representation of the Debtor.

³ In addition to finding that Winterhalter's actual conflict of interest necessitated disqualification and denial of compensation, the bankruptcy court also held that the Firm's failure to comply with Bankruptcy Rule 2014 also provided grounds to disqualify and sanction Winterhalter. Attorneys who seek approval by the court to represent a debtor, pursuant to § 327(a), must file an application for employment that complies with the disclosure requirements of Rule 2014. Rule 2014(a) requires that "[t]he application shall state . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest," and "shall be accompanied by a verified statement . . . setting forth the person's connections with the debtor, creditors, [and] any other party in interest . . . ." The duty to disclose under Rule 2014 continues throughout an attorney's representation of the debtor, and requires "spontaneous, timely, and complete disclosure . . . ." *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994). Several Courts have stated that failure to disclose is a sufficient ground to deny compensation, and some have also stated that it merits disqualification. *See, e.g., Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) ("[F]ailure to disclose is sufficient grounds to revoke an employment order and deny compensation."); *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 882 (9th Cir. 1995) ("Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees."); *Rome*, 19 F.3d at 60 (finding that a failure to disclose provided sufficient ground to deny compensation). Here, Winterhalter violated Rule 2014 when it failed to disclose its representation of Union One. Winterhalter does not appeal the bankruptcy court's decision that it failed to comply with Rule 2014. While this lack of disclosure may independently provide a sufficient ground for the bankruptcy court's decision to disqualify Winterhalter and deny compensation, when considered in combination with Winterhalter's actual conflict of interest, it becomes abundantly clear that the bankruptcy court did not commit an abuse of discretion.

Case 09-10384-jkf    Doc 455    Filed 11/17/11    Entered 11/22/11 14:16:31    Desc Main
Document    Page 16 of 20

res judicata and collateral estoppel only apply to re-litigation of issues or claims decided in a prior case. *See, e.g., Duhaney v. Att'y Gen. of U.S.*, 621 F.3d 340, 347 (3d Cir. 2010) ("Res judicata, also known as claim preclusion, bars a party from initiating a second suit against the same adversary based on the same 'cause of action' as the first suit."); *Delaware River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 572 (3d Cir. 2002) ("Under the doctrine of issue preclusion, a determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity. . . . Stated broadly, issue preclusion prevents relitigation of the same issues in a later case."). Therefore, collateral estoppel and res judicata are inapplicable because both of the bankruptcy court's disqualification orders were part of the same litigation.

Unlike collateral estoppel and res judicata, the law of the case doctrine "is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing legal precept in later stages." *In re Continental Airlines, Inc.*, 279 F.3d 226, 232-33 (3d Cir. 2002). Thus, the law of the case doctrine is the proper framework for analyzing Winterhalter's preclusion argument.

"The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). The purpose of the doctrine is to promote finality and judicial economy. *Id.* Rather than limit a federal court's power, the law of the case directs its exercise of discretion. *Id.* There are several "extraordinary circumstances" that the Court of Appeals for the Third Circuit has identified as warranting reconsideration of an issue decided at an earlier stage in the same litigation. *Id.* One of those circumstances is the

availability of new evidence. *Id.* "This exception to the law of the case doctrine makes sense because when the record contains new evidence, the question has not really been decided earlier and is posed for the first time." *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003) (internal quotation marks omitted). However, for this to be true, the new evidence must materially differ from the evidence initially presented and it must undermine support for the initial decision on the issue. *Id.*

Winterhalter argues that, under the law of the case doctrine, the bankruptcy court's May 10, 2010 disqualification order should have precluded it from entering the March 10, 2009 disqualification order. In doing so, Winterhalter alleges that the bankruptcy court was fully aware of the Firm's representation of Union One in the district court litigation at the time it decided to disqualify the Firm as of May 10, 2010 because the bankruptcy court had authorized a stipulated agreement in May of 2009 that mentioned the Union One district court litigation. Therefore, Winterhalter posits that the law of the case should prohibit disqualification of the Firm prior to May 10, 2010 because the court was not presented with any new evidence for which to alter its earlier decision.

It is entirely disingenuous of Winterhalter to argue that the bankruptcy court was aware of the Firm's representation of Union One prior to entering its May 10, 2010 disqualification order. While the record supports that the bankruptcy court did authorize a stipulated agreement that mentions the Union One district court litigation, nowhere does that document inform the court that Winterhalter was serving as counsel for Union One in that litigation. Rather, the record clearly demonstrates that the court did not become aware of Winterhalter's simultaneous

representation of the Debtor and Union One until after the UST discovered this fact in the summer of 2010.

The court's first disqualification order was based on Winterhalter's impermissible relationship with Archway; whereas, the court's second disqualification order was based on Winterhalter's impermissible relationship with Union One. The evidence of Winterhalter's representation of Union One, which did not become available to the court until after the entry of the May 10, 2010 disqualification order, materially differed from the evidence that formed the basis of the court's first disqualification order and drastically undermined the court's decision to allow Winterhalter to represent the Debtor until May 10, 2010. The newly available evidence of Winterhalter's representation of Union One is an extraordinary circumstance that warranted the bankruptcy court to reconsider its earlier disqualification order. Therefore, the bankruptcy court was not barred by the law of the case from disqualifying Winterhalter as of March 10, 2009.

### C. Disgorgement

Lastly, Winterhalter argues that even if the bankruptcy court properly disqualified the Firm as of March 10, 2009, the court lacked jurisdiction to order disgorgement of fees received by Winterhalter from third parties. Although Winterhalter concedes that under 11 U.S.C. § 329(b) the district court had jurisdiction to order disgorgement of unreasonable and excessive fees paid by third parties, the Firm denies that its fees were unreasonable.

Section 329(b) authorizes a bankruptcy court to order the return of attorney's fees to a third party payor "[i]f such compensation exceeds the reasonable value of any such services . . . ." In the context of bankruptcy, the Supreme Court has explained that "[R]easonable compensation for services rendered necessarily implies loyal and disinterested service in the

interest of those for whom the claimant purported to act. Where a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation." *Woods v. City Nat. Bank & Trust Co. of Chicago*, 312 U.S. 262, 268 (1941) (citations omitted) (internal quotation marks omitted). "Although *Woods* was decided under Chapter X of the Bankruptcy Act, many courts still rely on its applicable standard for disallowance and disgorgement of fees in cases involving conflicts of interest by debtors' counsel." *In re McGregory*, 340 B.R. 915, 922 (B.A.P. 8th Cir. 2006). In harmony with the Supreme Court's opinion in *Woods*, several courts have held that a court has discretion under § 329 to order disgorgement of fees when a conflict of interest exists because of its relevancy in determining whether an attorney's fees are unreasonable or excessive. *See In re Wiredyne, Inc.*, 3 F.3d 1125, 1128 (7th Cir. 1993) (explaining that, under § 329, "[t]he existence of a conflict of interest is certainly a relevant factor in this analysis and is a justifiable reason to reduce or require disgorgement of attorneys' fees"); *McGregory*, 340 B.R. at 922 ("[U]nder § 329 . . . conflicts of interest by a debtor's attorney can, standing alone, justify denial of all fees."); *In re Smith-Canfield*, No. 08-61630-fra13, 2011 WL 1883833, at *8 (Bankr. D. Or. May 17, 2011) (holding that "[i]n making its § 329 determination the court may consider whether the attorney had a conflict of interest when providing services," and ordering an attorney, pursuant to § 329, to disgorge fees because of the existence of a conflict of interest); *In re Vann*, 136 B.R. 863, 871 (Bankr. D. Colo. Feb. 5, 1992) (recognizing that "conflicts of interest, standing alone, could justify the denial of all fees," and holding that the bankruptcy court did not abuse its discretion in ordering disgorgement, pursuant to § 329, because of a law firm's conflict of interest).

Here, the bankruptcy court ordered Winterhalter to return all fees that it incurred after the Firm was disqualified on March 10, 2009. The reason for the court's disqualification of Winterhalter was the existence of an actual conflict of interest that developed when the Firm entered its appearance as counsel for Union One in the district court litigation. Thus, the court did not lack jurisdiction to order Winterhalter to return fees received from third parties because this conflict alone provided the court with a sufficient basis under § 329 to order disgorgement.

## IV. CONCLUSION

For the reasons stated above, I will affirm the bankruptcy court's order entered on June 3, 2011.

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on 11/17/11 to:

Copies **MAILED** on 11/17/11 to:

The Harris Agency LLC
Jean K. Fitzsimon
R Tuck Neilson
Timothy B. McGrath

O:\ABB 2011\A-K\Harris (11-4525) Bankruptcy Memorandum.wpd